**Jeffrey A. MANNING Appellant**

v.

**WPXI, INC., A Corporation and Subsidiary of Cox Enterprises, Inc., A Corporation; Cox Enterprises Inc., A Corporation; David Johnson, an Individual, Scott Newman, an Individual, Ursula Riggins, an Individual, and Bridget Eiselt, an Individual.**

Superior Court of Pennsylvania.

Argued Nov. 16, 2004.

Filed Oct. 11, 2005.

Reargument Denied Dec. 20, 2005.

1138

**1140**

John E. Quinn, Pittsburgh, for appellant.

Walter P. DeFrost, III, Pittsburgh, for Johnson, appellee.

Before: BENDER, PANELLA, and JOHNSON, JJ.

JOHNSON, J.

¶ 1 In this case, we consider whether the Appellant, Judge Jeffrey A. Manning of the Allegheny County Court of Common Pleas, satisfied the actual malice standard in his defamation suit against WPXI and others arising from WPXI's broadcast of news reports regarding an incident which occurred at Pittsburgh International Airport. The trial court in this action found that Manning, as a public figure, must prove actual malice on the part of WPXI, reporter David Johnson and producer Scott Newman. Finding that Manning did not prove actual malice, the trial court entered summary judgment in favor of WPXI, Johnson and Newman ("Appellees"). Manning appeals the Order, contending that there was sufficient evidence of the falsity and lack of investigation on Appellees' parts to satisfy the actual malice standard. For the reasons that follow, we affirm the decision of the trial court.

¶ 2 The factual background of this case begins on December 20, 1995, when Manning and his fiancée, Kathleen Murphy, drove Manning's son, Richard Manning, to Pittsburgh International Airport. Upon arrival at the airport, they proceeded to the main security checkpoint. Manning was holding his son's garment bag when they reached the security checkpoint. At the checkpoint, Manning was concerned that the garment bag, which was thin plastic and inexpensively made, would tear if it were sent through the magnetometer, i.e., the x-ray machine, in the usual manner. Therefore, Manning asked the x-ray operator, Ursula Riggins, an African–American woman, to be "careful" with the garment bag. Riggins sent the garment bag through the x-ray machine, but when it came through the machine it was torn. When Manning saw the tear he confronted Riggins. The events which transpired thereafter are fiercely disputed by both sides and the subject of the present litigation.

¶ 3 According to Riggins and several other Ogden Security employees, Manning used a racial slur. Following the incident, Riggins provided her employer with two written statements completed the same day as the incident. In the first statement, Riggins attributed the racial slurs to Manning's son and fiancée, whom Riggins referred to as Manning's wife. In this initial statement, she noted that "his wife and his son kept giving me the finger (middle) and called me a n——r several times." In her second statement, Riggins attributed a racial slur to Manning as she explained that Manning called her a "f——g n——r."

¶ 4 Several other Ogden employees corroborated Riggins's statement. Bridget Eiselt wrote in a signed statement that "the man was also making racial slurs, he said to his wife and everyone that was listening 'see give a n——r a job and look how they act.'" Michael Melnikof stated in his statement that Manning made "vile, lucrid [sic] and intoxicating remarks," including, "[s]ee what happens when you

give a black person a job." Additionally, Wayne Boley noted that "[t]here were very racial remarks shouted out by Mr. and Mrs. Manning to PDS Riggins that was [sic] loud enough for many people to hear." Further, Jeff Match noted that "he began shouting and using racial remarks about Riggins to his wife who was standing by the podium." Lastly, Susan Grove stated that "he proceeded to make some un-called-for racial remarks to his wife in a very loud and arrogant manner."

¶ 5 To the contrary, Manning contends that he did not use a racial slur; rather, he notes that he confronted Riggins in a non-argumentative manner and that Riggins inexplicably became enraged and screamed, "I'm going to kick your ass." In his amended complaint, Manning conceded that a racial slur was used, but attributed the slur to his fiancée. However, at his deposition, Manning denied hearing his fiancée make any racial slurs.

¶ 6 During the confrontation between Manning and Riggins, Kathleen Murphy left, at Manning's direction, to find a police officer. Murphy located Sergeant Donald Fox, a professional acquaintance of Manning's. Shortly thereafter, Sergeant Fox arrived at the site of the confrontation and had to physically separate Manning from Riggins. Sergeant Fox also radioed for assistance, after which, patrolmen Jason Harrison, Jeffrey Mohr, and David Hustler responded. Upon their arrival at the scene, however, the confrontation had ended and Manning, his son, and fiancée had already departed. Patrolman Hustler returned to his post, but Patrolmen Harrison and Mohr remained at the scene and Sergeant Fox directed Patrolman Harrison to write a report of the incident.

¶ 7 Thereafter, Manning's son and fiancée returned to the security checkpoint to pick up a piece of luggage they had forgotten. At that time, Patrolman Harrison interviewed Manning's fiancée about the incident. Patrolman Harrison also interviewed Bridget Eiselt and Riggins. Following the interviews, Patrolman Harrison returned to the police station to complete his report.

¶ 8 WPXI subsequently learned of the incident involving Manning and Riggins in late December 1995 or early January 1996 when it received three anonymous tips on its investigation hotline. Riggins also called the hotline and left her name and telephone number. Scott Newman, the investigative producer who received Riggins's message, contacted Riggins to discuss the incident. Riggins explained to Newman that Manning had used the word "n——r" during their dispute. Upon hearing Riggins's description of the incident, Newman initiated an investigation.

¶ 9 Newman first went to Riggins's home where he taped an on-camera interview with Riggins in which she again stated that Manning called her a "n——r" during the incident. Thereafter, Newman learned that written statements of the incident completed by security employees existed; Newman eventually obtained the reports on or about January 10, 1996. Newman then arranged an on-camera group interview of the five employee eyewitnesses: Mike Melnikof, Bridget Eiselt, Jeff Match, Frank Aiello, and Wayne Boley. David Johnson, a reporter at WPXI, conducted the interview. During the interview, all five witnesses confirmed that Manning had used the word "n——r" in reference to Riggins during the incident.

¶ 10 Newman and Johnson next attempted to speak with Manning about the incident and went to the courthouse in Pittsburgh to request an interview. Manning refused to meet with them, and instead, Newman and Johnson spoke with Manning's attorney, Gary Zimmerman, Esquire. Zimmerman told them that

Manning had not used a racial slur during the confrontation, but offered no other details or explanation regarding the incident.

¶ 11 The deposition of Attorney Gary Zimmerman provides the main thrust of Manning's defamation claim. On January 22, 1996, following their initial conversation at the courthouse, Zimmerman spoke with Newman over the telephone, and informed Newman that the police report indicated that Manning had not used any racial slurs; rather, Zimmerman told Newman that the police report stated that Manning's fiancée had used a racial slur directed at Riggins. On January 23, 1996, Zimmerman contacted Newman to inquire as to whether he planned on running the story in light of the police report. Zimmerman noted that Newman responded by stating, "[w]ell, I'm going to go with the story the way I want to go with it." Zimmerman then requested that Newman's report reflect the facts as contained within the police report, but Newman refused Zimmerman's request stating, "I'm not going to do that because that doesn't fit into my program." When Zimmerman objected and informed Newman that he did not believe that his story would reflect the incident's actual events, Newman stated, "I don't care what the truth is. I'm running the story my way."

¶ 12 On January 24, 1996, Zimmerman sent Newman a letter instructing him not to contact Manning, his son, or fiancée, and the letter also noted that Manning would commence a legal action against WPXI if the station broadcasted any story about the incident. On January 30, 1996, Daniel Berger, Esquire, another one of Manning's attorneys, sent Newman a letter in which he again explained that Manning had not used any racial slur.

¶ 13 Newman then contacted Patrolman Harris, the police officer who drafted the police report, and Patrolman Harris, while refusing to be interviewed for the story, told Newman that he "stood behind" his report. Newman also contacted Sergeant Fox, who had agreed to be interviewed on camera. Thereafter, Sergeant Fox informed Newman that he did not hear any racial slurs, but that he could not say conclusively that no racial slurs had been spoken.

¶ 14 On February 1 and 2, 1996, on its 6:00 p.m. and 11:00 p.m. news broadcasts, WPXI aired reports about Manning's alleged utterances of racial slurs at the airport. WPXI reported the story again on February 5th and 6th, on its 6:00 p.m. and 11:00 p.m. news broadcasts. In its reports, WPXI used footage from the taped interviews of the Ogden Security employees in which the employees stated that Manning used the word "n——r" in reference to Riggins. The news reports repeatedly stated that Manning, through his attorney, denied the allegations. The reports also included the fact that the police report did not state that Manning used a racial epithet.

¶ 15 On January 24, 1997, Manning commenced a civil action against WPXI, Scott Newman and David Johnson, as well as Riggins and Eiselt. Manning filed an amended complaint on August 1, 1997, which contained counts for defamation and civil conspiracy. Following extensive discovery, Appellees moved for summary judgment on February 15, 2001, in which they argued that the facts of record do not establish that Appellees acted with actual malice. Furthermore, Appellees argued, *inter alia*, that the civil conspiracy claim must fail because there was insufficient evidence to establish the underlying intent to defame. The trial court granted Appellees' motion for summary judgment on November 26, 2002. This timely appeal followed.

¶ 16 On appeal, Manning raises the following issues for our review:

1. Whether or not the [t]rial [c]ourt erred in concluding that Plaintiff failed to establish actual malice and granting summary judgment in favor of Defendants WPXI, Johnson and Newman?

2. Whether or not the [t]rial [c]ourt erred by finding, at the summary judgment stage, that Plaintiff's evidence (concerning statements of Newman that he did not care about the truth) had been refuted?

3. Whether or not the [t]rial [c]ourt erred in granting summary judgment where its decision is based upon resolution of disputed factual issues and/or credibility issues?

Brief for Appellant at 3.

¶ 17 While Manning purports to raise three issues for our review, in actuality, he raises only one: At this state of the proceedings, has Manning provided evidence which could be considered clear and convincing, sufficient to reach a jury, which demonstrates that the Appellees broadcasted the allegedly defamatory statements with actual malice?

¶ 18 We conclude that the trial court properly determined that Manning failed to adduce sufficient evidence to establish a *prima facie* case of defamation and properly granted the Appellees' motion for summary judgment.

¶ 19 We shall reverse a grant of summary judgment "only if the trial court has committed an error of law or abused its discretion." *Weber v. Lancaster Newspapers, Inc.*, 878 A.2d 63, 71 (Pa.Super.2005). "Judicial discretion requires action in conformity with law based on the facts and circumstances before the trial court after hearing and consideration." *Gutteridge v. A.P. Green Servs.*, 804 A.2d

643, 651 (Pa.Super.2002). "Where the discretion exercised by the trial court is challenged on appeal, the party bringing the challenge bears a heavy burden." *Paden v. Baker Concrete Constr., Inc.*, 540 Pa. 409, 658 A.2d 341, 343 (1995).

[I]t is not sufficient to persuade the appellate court that it might have reached a different conclusion if, in the first place, charged with the duty imposed on the court below; it is necessary to go further and show an abuse of the discretionary power. An abuse of discretion is not merely an error of judgment, but if in reaching a conclusion the law is overridden or misapplied, or the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias or ill-will, as shown by the evidence or the record, discretion is abused.

*Id.* (internal quotations and citations omitted).

¶ 20 As the trial court properly found, Manning, as a public figure, must prove that the Appellees acted with actual malice. " 'Actual malice' is a fault standard, predicated on the need to protect the public discourse under the First Amendment from the chill that might be fostered by less vigilant limitations on defamation actions brought by public officials." *Lewis v. Philadelphia Newspapers, Inc.*, 833 A.2d 185, 191 (Pa.Super.2003). The actual malice standard is "a rigorous, if not impossible, burden to meet in most circumstances." *See Weaver v. Lancaster Newspapers Inc.*, 875 A.2d 1093, 1103 (Pa.Super.2005) (McCaffery, J., concurring). Indeed, the actual malice standard "goes so far as to forbid imposition of liability even in those instances where the defendant negligently publishes false, defamatory statements about a public figure or public official."

*Norton v. Glenn,* 580 Pa. 212, 860 A.2d 48, 56 (2004).

¶ 21 The actual malice standard "is a constitutionally mandated safeguard, and, as such, must be proven by clear and convincing evidence, the highest standard of proof for civil claims." *Lewis,* 833 A.2d at 192. This standard requires evidence "so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitancy of the truth of the precise facts in issue." *Matter of Braig,* 520 Pa. 409, 554 A.2d 493, 495 (1989). If the plaintiff in a defamation case fails to put forth evidence sufficient to support a finding of actual malice, the trial court may grant summary judgment in favor of the defendant. *See Weaver,* 875 A.2d at 1102.

¶ 22 To establish actual malice, there "must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication." *Curran v. Philadelphia Newspapers, Inc.,* 376 Pa.Super. 508, 546 A.2d 639, 642 (1988) (citing *St. Amant v. Thompson,* 390 U.S. 727, 731, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968)). "Failure to investigate, without more, will not support a finding of actual malice, nor will ill will or a desire to increase profits." *Fitzpatrick v. Philadelphia Newspapers, Inc.,* 389 Pa.Super. 438, 567 A.2d 684, 688 (1989) (citing *St. Amant,* 390 U.S. 727, 88 S.Ct. 1323, 20 L.Ed.2d 262). The fact that Appellees could have employed a higher degree of journalistic responsibility does not constitute actual malice. *See Lewis,* 833 A.2d at 192. "Mere negligence or carelessness is not evidence of actual malice or malice in fact." *Curran,* 546 A.2d at 645 (citing *New York Times Co. v. Sullivan,* 376 U.S. 254, 283, n. 24, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964)). Finally, in a situation such as this, when the plaintiff's position is not determinative on an issue, the

communication of a denial by a plaintiff does not usually constitute evidence of actual malice. *See Tucker v. Philadelphia Daily News,* 577 Pa. 598, 848 A.2d 113, 133, n. 23 (2004).

¶ 23 Considering the standard of review we must employ, along with the high burden of proof placed upon Manning, we conclude that the trial court did not abuse its discretion in granting summary judgment in favor of the Appellees. As the trial court properly found, Manning was unable to meet the rigorous actual malice standard. In its decision, the trial court noted that in addition to interviewing Riggins, Appellees did not air the story until approximately 4–5 weeks after receiving the anonymous tips and after interviewing seven witnesses to the event. *See* Trial Court Opinion, 11/21/02, at 17. Further, Appellees interviewed every eyewitness that was willing to speak to them. *See id.* Appellees persisted until they obtained a copy of the county police report, despite the fact that they were initially told none existed. *See id.* Appellees interviewed the one police officer who had been present and who agreed to an interview. *See id.* Appellees reinterviewed Riggins to confront her with contents of the police report and reconfirmed that Manning made the statements and that she so told the police. *See id.* at 18. Appellees tried to interview Manning, but were prevented from doing so. *See id.* Finally, Appellees met with Manning's attorney to discuss the incident. *See id.*

¶ 24 These facts alone provide a basis upon which the trial court could have properly exercised its discretion and found that Manning failed to satisfy the actual malice standard. Indeed, there is a plethora of case law finding an absence of actual malice when the media appellant acted with significantly less corroboration and investigation. *See e.g., St. Amant,* 390 U.S. at

730, 88 S.Ct. 1323 (holding that trial court properly found lack of evidence for actual malice despite fact that defendant relied solely upon affidavit of single person of unknown credibility); *Curran*, 546 A.2d at 651 (finding lack of evidence for actual malice where reporter mischaracterized statements made during a press conference because of his own admittedly faulty assumptions, despite the fact that fellow reporter had accurately relayed the content of the press conference).

¶ 25 Further, contrary to Manning's argument that the report was unbalanced and, therefore, indicative of actual malice, we find instead that the actual content of the news report supports the trial court's finding. *See e.g., Tucker*, 848 A.2d at 120 (looking at actual news paper articles to determine if public figure could successfully make claim for defamation). In addition to broadcasting the interview of Riggins and five other airport employees that were in the area when the incident occurred, the news reports clearly indicated that Manning repeatedly denied that he used a racial epithet, and specifically discussed the fact that the Allegheny County Policy Report does not contain any allegations that Manning made racial slurs during the incident. Script of News Reports, February 1, 1996 (R.R. 000052—000073). The reports also contain an interview of Fox, who stated that he did not hear Manning make any racial remarks, but noted that he was not present for the entire altercation. Script of News Reports, February 1, 1996 (R.R. at 000061, 0000072). Finally, the reports included the following statements from Manning's attorneys in which they categorically denied the allegation, "Judge Manning is not going to be a willing participant in a story that serves only to create controversy.... My investigation of the matter reveals that my client did not make any racially discriminatory comments to anyone." Excerpt from letter from Gary Zimmerman, included in WPXI Broadcast, Script of News Reports, February 1, 1996 (R.R. 000060; R.R. 000071).

¶ 26 Similarly, a statement from Manning's subsequent attorney also ran with the broadcast: "A person like Judge Manning who has demonstrated over many years, both as a prosecutor and judge, that he treats all racial groups equally, does not, out of the blue, utter a racial epithet..." Script of News Reports, February 1, 1996, (R.R. 000060; 000071).

¶ 27 The broadcast, which repeatedly reported that Manning denied making any racial slurs, presented both sides of the story, and, consequently, can not support a finding of actual malice. *See Tucker*, 848 A.2d at 133 (finding that "[a]lthough an article is not made defamatory by being unfair, the Philadelphia Daily News acted in an even handed manner by extensively quoting the attorney for the Tuckers..."). It further included a discussion of the police report, which Manning's counsel specifically requested be included.

¶ 28 In addition to arguing that the report was unbalanced and therefore indicative of actual malice, Manning sets forth an extended list of evidence in this case which supports a finding of actual malice or a reckless disregard for the truth. For example, Manning relies upon the fact that in Riggins's first statement, she stated that Murphy used a racial slur, and in the second statement, she stated that Manning used a racial slur as evidence that Appellees had obvious reason to doubt the veracity of the allegations. Manning also claims that the police report, which did not state that Manning used any epithets, should have raised serious doubts as to the truthfulness of the allegations. Similarly, Manning relies upon the fact that there is an inconsistency between the

written report and oral interview given by one of the six witnesses the Appellees interviewed.

¶ 29 These alleged inconsistencies are not evidence of actual malice or a reckless disregard for the truth when taken in the context of the findings of the Appellees' investigation and report. Preliminarily, WPXI's investigative producer, Newman, testified that he believed that the two statements constituted a single report, and did not realize they were two separate reports until after the segments aired. *See* Deposition of Scott Newman, at 59–63 (R.R. 000252–257). Riggins testified during her deposition that when she filled out the first incident report, she handed it to her supervisor and said that she quit. *See* Deposition of Ursula Riggins, 09/07/00, at 103 (R.R. 000156). Her supervisor reviewed the report and told her that the report was not complete and that Riggins needed to write down everything that happened. *Id.* At that point Riggins drafted the second statement. *Id.* Finally, and perhaps most notably, the two reports do not contradict each other in any manner. *Compare* No. 1 Narrative of U. Riggins, December 20, 1995 (R.R. 000159) *with* No. 2. Narrative of U. Riggins, December 20, 1995 (R.R. 000160–162).

¶ 30 Similarly, the other alleged inconsistency—that one of the seven eye-witnesses, Aiello, made an oral statement that was inconsistent with an earlier written statement—does not satisfy the rigorous standard of actual malice by clear and convincing evidence. The Appellees' report was not based upon the interview of Aiello alone. It was the result of a significant investigative effort, in which seven individuals, six of whom had absolutely no motive to fabricate the story, stated that they overheard Manning use a racial epithet. Taken in the context of the entire investigation, the fact that one of these individuals initially stated that he walked away from the confrontation but later said that he overheard Manning use a racial slur towards Riggins does not establish that Appellees acted with actual malice.

¶ 31 Finally, Manning argues that the statements Newman allegedly made to Manning's attorney are sufficient to establish actual malice. Specifically, after Manning's attorney informed Newman of the existence of a police report, Newman told Manning's attorney, "[I]'m going to go with the story the way I want." Zimmerman Deposition, 9/19/00, at 76 (R.R. 000315). According to Zimmerman, he then asked Newman if the report would reflect the facts as stated in the police report, to which Newman allegedly replied, "I'm not going to do that because that doesn't fit into my program" and "I don't care what the truth is. I'm running the story my way." Zimmerman Deposition, 9/19/00, at 77 (R.R. 000316). Assuming that Newman made these comments, as we must for purposes of summary judgment, a review of the allegedly defamatory broadcast shows that, as requested by Manning's attorney, the report includes a discussion of the police report and specifically states that it does not contain an allegation that Manning used a racial slur. It is perplexing that Manning is arguing that Newman's statements, which were made to one individual, should trump the actual content of the published broadcast, which included a discussion of the very item that Newman allegedly stated that he would not discuss.

¶ 32 It is also worth noting, that far from being dispositive as to whether Manning actually used a racial slur, the police report is silent as to whether Manning used a racial slur. It does not say that he used one, nor does it say that he did not use one. Police Report, 12/20/95 (R.R. 000343–000344). During his deposi-

tion, Harrison, the officer that wrote the report, testified that Riggins may have said things that did not make it into his report. Deposition of Patrolman Jason Harrison, 10/11/00, at 82 (R.R. 000210). Riggins testified during her deposition, she was upset and humiliated when she made the report to the police officers, although she stated, under oath, that she told Harrison that Manning used a racial epithet. *See* Deposition of Ursula Riggins, 09/07/00, at 103 (R.R. 000155). Further, to the extent that the police report and the written statements of the other witnesses may differ, that alone does not suffice to establish actual malice, particularly in light of the fact that the Appellees clearly and repeatedly stated that the police report does not state that Manning used any racial epithets.

¶ 33 Manning also argues that the fact that the Appellees did not interview Manning's son and his fiancée are indicative of actual malice. Brief for Appellant at 33. This argument is unavailing because it was Manning's own attorney that informed the Appellees that they were not to interview Manning, Manning's son or his fiancée. *See* Letter from Zimmerman to Newman, 01/24/96 (R.R. 000334). Manning's other argument that Appellees practiced "sub-standard journalism", is equally unavailing. Brief for Appellant at 30. Even if we were to find that Appellees were irresponsible or even negligent journalists, this will not satisfy the actual malice standard. *See Lewis*, 833 A.2d at 192.

¶ 34 The trial court exercised its discretion and properly found that Manning was unable to put forth sufficient evidence to prove that the Appellees acted with a reckless disregard for the truth. Appellees spent a significant amount of time investigating the story and broadcasted reports that presented both sides of the story; as

such, there is no actual malice and the trial court did not abuse its discretion.

¶ 35 Judgment **AFFIRMED.**

¶ 36 PANELLA, J. files a Dissenting Opinion.

PANELLA, J., Dissenting:

¶ 1 The issue in this case is whether Manning has, at this stage of the proceedings, provided clear and convincing evidence which demonstrates that the Appellees broadcasted the allegedly defamatory statements with actual malice. In a well-written Opinion, the Majority finds that Manning failed to adduce adequate evidence to establish a cause of action for defamation, and thus, affirms the trial court's grant of Appellees' motion for summary judgment. My review of the record, however, indicates that Manning, as the non-moving party, produced sufficient evidence from which a jury could reasonably infer falsity and actual malice from the objectionable broadcasts. Accordingly, I must respectfully dissent.

¶ 2 We may reverse the entry of summary judgment only where we find that the trial court erred in concluding that either (1) no genuine issue of material fact existed, or (2) the moving party was entitled to judgment as a matter of law. *See Phillips v. Cricket Lighters*, 576 Pa. 644, 841 A.2d 1000, 1004 (2003). We must review the record in the light most favorable to the nonmoving party, resolving all doubts and drawing all inferences against the moving party. *Atcovitz v. Gulph Mills Tennis Club, Inc.*, 571 Pa. 580, 586, 812 A.2d 1218, 1221 (2002). As the appeal *sub judice* presents a question of law, our scope of review is *plenary*. *McCarthy v. Dan Lepore & Sons Co., Inc.*, 724 A.2d 938, 941 (Pa.Super.1998), *appeal denied*, 560 Pa. 707, 743 A.2d 921 (1999).

¶ 3 In applying the above legal standards in a defamation claim involving a public figure, the non-moving party

> must adduce sufficient evidence on an issue essential to his case and on which he bears the burden of proof such that a jury could return a verdict in his favor. Failure to adduce this evidence establishes that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.

*Ertel v. Patriot–News Co.*, 544 Pa. 93, 101–102, 674 A.2d 1038, 1042 (1996), *cert. denied*, 519 U.S. 1008, 117 S.Ct. 512, 136 L.Ed.2d 401 (1996). It is critical that at this stage of the litigation we review the record in the light most favorable to the non-moving party, and we give the benefit of all reasonable inferences and resolve all doubts in favor of the non-moving party. *See Lewis v. Philadelphia Newspapers, Inc.*, 833 A.2d 185, 190 (Pa.Super.2003), *appeal denied*, 577 Pa. 690, 844 A.2d 553 (2004).

¶ 4 Initially, I note that Manning concedes that he is a public official.[1] To survive summary judgment, Manning, as a public official, must not only come forward with evidence to show that the statements were false, *see, e.g., Tucker v. Philadelphia Daily News*, 577 Pa. 598, 621, 848 A.2d 113, 127–128 (2004), but he must also present evidence from which a jury could reasonably conclude that the evidence clearly and convincingly shows Appellees acted with actual malice.[2] *See Norton v. Glenn*, 580 Pa. 212, 216 n. 3, 860 A.2d 48, 50 n. 3 (2004), *cert. denied*, —— U.S. ——, 125 S.Ct. 1700, 161 L.Ed.2d 539, 73 USLW 3462 (2005).

¶ 5 Actual malice is not established by showing that the publisher had an ill will or desire to do harm. *See Harte–Hanks Communications, Inc. v. Connaughton*, 491 U.S. 657, 666–667, n. 7, 109 S.Ct. 2678, 105 L.Ed.2d 562 (1989) ("The phrase 'actual malice' is unfortunately confusing in that it has nothing to do with bad motive or ill will."). Rather, actual malice is a subjective standard of recklessness. We explained in *Curran v. Philadelphia Newspapers, Inc.*, 376 Pa.Super. 508, 546 A.2d 639 (1988), *appeal denied*, 522 Pa. 576, 559 A.2d 37 (1989), that:

> [r]eckless conduct is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing. There must be sufficient evidence to permit the conclusion that **the defendant in fact entertained serious doubts as to the truth of his publication.** Publishing with such doubts shows reckless disre-

---

1. Manning's status as a judge unquestionably makes him a public official. *See, e.g., DiSalle v. P.G. Publishing Co.*, 375 Pa.Super. 510, 544 A.2d 1345, 1348 (1988). I note, however, that the alleged misconduct attributed to Manning took place while he was not acting in his official capacity, i.e., the conduct took place while he was involved in private matters. Nonetheless, I find, and Manning does not dispute, that Manning's alleged behavior clearly touches on his fitness for office and, as such, Appellees are afforded the protection of the public-official rule, which requires a showing of actual malice. *See Garrison v. Louisiana*, 379 U.S. 64, 77, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964) (holding that public official rule protects "anything which might touch on an official's fitness for office").

2. There is no dispute among the parties that the challenged publications, i.e., the accusations of making racial slurs, are capable of a defamatory meaning. *See* 42 Pa.Cons.Stat. Ann. § 8343(a) ("In an action for defamation, the plaintiff has the burden of proving ... [t]he defamatory character of the communication."). A communication is defamatory if it "tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third parties from associating or dealing with him." *Tucker v. Philadelphia Daily News*, 577 Pa. 598, 615, 848 A.2d 113, 124 (2004).

gard for truth or falsity and demonstrates actual malice

546 A.2d at 642 (quoting *St. Amant v. Thompson*, 390 U.S. 727, 731, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968)) (emphasis added). There is no single all-encompassing definition of "reckless disregard" in the context of a defamation case; instead, the term is considered in light of the various factors involved in a particular case. *Curran*, 546 A.2d at 642. For instance, a plaintiff may prove reckless disregard by showing that the story was conceived entirely within the imagination of the television station, the television station had reason to doubt the veracity of its sources, or the story was so implausible that only a reckless person would have published it. *See generally, St. Amant*, 390 U.S. at 732, 88 S.Ct. 1323.

¶ 6 As discussed, actual malice must be proven by clear and convincing evidence. *Lewis v. Philadelphia Newspapers, Inc.*, 833 A.2d at 192. The determination of whether a plaintiff has established actual malice by the requisite clear and convincing evidence standard "may not be left in the realm of the factfinder." *Id.* As we noted in *Lewis*,

> [t]he question whether the evidence in the record in a defamation case is of the convincing clarity required to strip the utterance of First Amendment protection is not merely a question for the trier of fact. Judges, as expositors of the Constitution, must independently decide whether the evidence in the record is sufficient to cross the constitutional

threshold that bars the entry of any judgment that is not supported by clear and convincing proof of 'actual malice.' *Id.* (citation omitted).

¶ 7 Applying the foregoing principles, I find that viewing the evidence and all inferences arising therefrom in the light most favorable to Manning [3] demonstrates a genuine issue of fact from which a jury could reasonably find actual malice with convincing clarity. Manning's evidence demonstrates that conflicting accounts of the incident had been related to the Appellees, and that WPXI, through its agents Newman and Johnson, had a preconceived agenda in reporting the story with a slant against Manning.

¶ 8 The primary source in this case is Riggins. Riggins provided her employer with two written statements. In the first statement, Riggins detailed the incident involving Manning, but attributed the racial slurs to Manning's son and fiancée, whom she referred to as being Manning's wife. She noted that "his wife and his son kept giving me the finger (middle) and called me a n——r several times." Riggins, First Statement, 12/20/95. In her second statement, however, Riggins again detailed the incident, but this time attributed a racial slur to Manning as she explained that Manning called her a "f——g n——r." [4] Riggins, Second Statement, 12/20/95. As noted in the record, shortly after the incident, Patrolman Harrison interviewed Riggins and she attributed the racial slur to Manning's fiancée. The police report states that Riggins "saw the

---

**3.** As aforesaid, defamation actions do not require a different standard of review from other types of civil actions regarding summary judgment motions: "[W]e view the record in the light **most favorable to the non-moving party**, and all doubts as to the existence of a genuine issue of material fact must be resolved against the moving party." *Ertel v. Patriot–News Co.*, 544 Pa. 93, 98, 674 A.2d

1038, 1041 (1996), *cert. denied*, 519 U.S. 1008, 117 S.Ct. 512, 136 L.Ed.2d 401 (1996) (emphasis added).

**4.** In the second statement, Riggins again noted that Manning's son and fiancée were making obscene gestures and calling her a "n——r." Riggins, Second Statement, 12/20/95.

man's wife give her the finger and say '[n]——r.'" Police Report, 12/20/95. Nowhere in the police report is it indicated that Riggins attributed any racial slurs to Manning.

¶ 9 Manning argues that the conflicting accounts regarding the incident from the victim of the alleged verbal assault certainly should have provided Appellees with obvious reasons to doubt the truth of Riggins' later accusations. Thus, based solely upon the inconsistent statements of Riggins, Manning contends his defamation action is viable; Appellees published the defamatory statements regardless of the reasons to doubt the veracity of their sources.

¶ 10 To buttress his complaint, Manning points to evidence which suggests that Appellees purposefully ignored Riggins' conflicting statements. Manning's former attorney, Gary Zimmerman, testified that when he confronted Scott Newman with the police report, Newman told him "I'm going to go with the story the way I want to go with it." Zimmerman, Deposition, 9/19/00, at 76. Furthermore, attorney Zimmerman requested that the news broadcast reflect the events as recounted in the police report, i.e., that Manning had not used racial slurs; but Newman allegedly refused stating, "I'm not going to do that because that doesn't fit into my program." *Id.* When attorney Zimmerman objected and informed Newman that he did not believe that his story would reflect the incident's actual events, Newman purportedly stated, "I don't care what the truth is. I'm running the story my way." *Id.*

¶ 11 Manning further emphasizes the manner in which Appellees reported Frank Aiello's oral comments. Aiello's written statement, in its entirety, is as follows:

> I was working the # 4 mag and Ursula Riggins was working the # 3 X-ray. I

agree with Ursula on her report, up to where she told the gentleman to pick up his garment bag. I had to have the man scanned. He did not pick up his bag as Ursula asked him as he was going back to the scanner. I then went back to handling the mag and therefore cannot attest to the actions that followed.

Aiello, Statement, 12/21/95 (emphasis added). Despite his written statement, which Appellees had in their possession, during the taped interview, which was subsequently broadcasted, Aiello orally stated the following: "Of all the things I heard him [i.e., Manning] say, I did hear him make the one statement, that's what happens when you give a f and n a job." Broadcast, 2/1/96. At this stage of the litigation, in light of our standard of review, Manning plausibly argues that Aiello's taped statement blatantly contradicts his written statement, but yet Appellees reported his oral account without reservation.

¶ 12 Manning points out that Appellees did not make any effort to reconcile the discrepancies between Aiello's two statements or make the public aware of his differing accounts. To the contrary, on the February 1, 1996, broadcast, Johnson referred to the signed written statements and stated the following: "These incident reports completed and signed by six Ogden employees—who said they were in the area that day—all indicate Judge Manning made racial remarks—on the day in question." *Id.*

¶ 13 Lastly, I consider Appellees' argument that they are "entitled to summary judgment on the independent basis that [the publication] was privileged under the fair report or neutral report doctrines." Appellees' Brief, at 52. In this regard, I find that Appellees' argument is without merit.

¶ 14 In *Norton v. Glenn*, 580 Pa. 212, 216 n. 3, 860 A.2d 48, 50 n. 3 (2004), *cert. denied*, —— U.S. ——, 125 S.Ct. 1700, 161 L.Ed.2d 539, 73 USLW 3462 (2005), our Supreme Court refused to adopt the neutral reportage doctrine as it held that "neither the United States nor the Pennsylvania Constitutions mandate adoption of the neutral reportage doctrine." Thus, the neutral reportage doctrine cannot afford Appellees protection. Furthermore, the fair report doctrine "is a common law privilege protecting media entities which publish fair and accurate reports of governmental proceedings." *Id.*, 580 Pa. at 220 n. 6, 860 A.2d at 53 n. 6 (emphasis added). There is no governmental proceeding at issue in the present case, and therefore, the fair report doctrine is inapplicable.

¶ 15 Based on the foregoing, I would reverse the trial court's grant of summary judgment.[5] Thus, I respectfully dissent.

---

5. The trial court, without explaining its reasoning, granted Appellees' motion for summary judgment as to Count II of Manning's amended complaint, the civil conspiracy count. I assume the trial court granted the motion as to Count II because without Count I, the defamation count, there was no underlying tort. *See Burnside v. Abbott Laboratories*, 351 Pa.Super. 264, 505 A.2d 973, 980 (1985) (cause of action for civil conspiracy requires that two or more persons combine or enter agreement to commit unlawful act or to do otherwise lawful act by unlawful means). As I would reverse the grant of summary judgment as to Count I, the underlying tort would be reinstated, and thus, the trial court's grant of summary judgment as to Count II must necessarily also be reversed.